# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID CABRAL, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>vs.<br><br>CENGAGE LEARNING, INC., MCGRAW HILL, LLC (f/k/a MCGRAW-HILL GLOBAL EDUCATION HOLDINGS LLC); PEARSON EDUCATION, INC; and EDUCATIONAL PUBLISHERS ENFORCEMENT GROUP<br><br>*Defendants.* | Case No.<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiff David Cabral ("Plaintiff"), individually and on behalf of the proposed classes, by and through his counsel, for his Complaint against defendants Cengage Learning, Inc ("Cengage"), McGraw Hill, LLC, f/k/a McGraw-Hill Global Education Holdings, LLC ("McGraw Hill"); Pearson Education, Inc. ("Pearson"); and Educational Publishers Enforcement Group ("EPEG")[1] hereby states and alleges as follows:

## NATURE OF THE ACTION

1.    For decades, the Publisher Defendants have been able to sell higher education textbooks and other supplementary materials (collectively "Course Materials") at extremely high profit margins, as students have no choice but to purchase these overpriced Course Materials in order to academically succeed.

2.    However, the growing price of Course Materials, and the increasing disparity between

---

[1] All of these entities are collectively referred to herein as "Defendants." Cengage, McGraw, and Pearson are collectively referred to herein as the "Publisher Defendants."

the prices of new Course Materials and used Course Materials, has pushed more and more students over time into the secondary markets for used Course Materials. This, combined with the growing accessibility of the secondary market due to both the availability of online textbook copies and larger repositories for used books such as Amazon, began to temper the Publisher Defendants' enormous profits.

3.      In response, the Publisher Defendants, along with EPEG – the organization they formed to combat the secondary market sales – spearheaded a "digital first" movement, transitioning students from physical textbooks to online services. This movement is epitomized by their "Inclusive Access" agreements. "Inclusive Access" requires Class Members to purchase access codes to use Course Materials on a proprietary platform. Although Defendants are required to allow students to opt out from Inclusive Access, they have intentionally made the process confusing, misleading, or outright impossible, such that opt-out rates are extremely low and Plaintiff and the members of the putative classes described herein ("Class Members") are *de facto* locked into using Inclusive Access.

4.      The use of Inclusive Access effectively denies students the ability to purchase used materials or to seek any competitive market prices. Moreover, students are unable to sell the Inclusive Access materials as used once the course is over, eliminating any purported savings from the program.

5.      These actions by the Defendants unlawfully restrain trade and result in supracompetitive prices for Court Materials in violation of federal antitrust laws. These actions have been ongoing since at least January 1, 2016, and continue through the present.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act,

15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b) and (c) because one or more Defendants reside, are licensed to do business, are doing business, or transact business in this District.

8.      This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business in this District; (b) sold substantial quantities of the Course Materials at issue in this District; and (c) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons residing in or located in this District.

## THE PARTIES

### A.      Plaintiff

9.      Plaintiff David Cabral is a resident of New Jersey.  During the Class Period, Plaintiff was a student who enrolled in courses that used Inclusive Access and purchased Course Materials from Inclusive Access directly from one or more Defendants and Retail Co-Conspirators.  As a direct result of Defendants' unlawful scheme, Plaintiff was forced to pay inflated prices for his Course Materials, and suffered direct harm as a result.

### B.      Defendants

10.      Defendant Cengage is a Delaware corporation headquartered in Boston, Massachusetts. During the Class Period, Cengage published and sold Course Materials though Inclusive Access.

11.      Defendant McGraw Hill is a Delaware LLC with its corporate headquarters in New York, New York. During the Class Period, McGraw Hill published and sold Course Materials though Inclusive Access.

12.      Defendant Pearson is a Delaware corporation headquartered in Upper Saddle River, New Jersey. During the Class Period, McGraw Hill published and sold Course Materials though Inclusive Access.

CLASS ACTION COMPLAINT FOR DAMAGES

13.     Defendant EPEG is an entity created, financed, and operated by Cengage, McGraw Hill, and Pearson throughout the Class Period. As more fully detailed herein, EPEG was used as a vehicle for the implementation and maintenance of the Defendants' conspiracy, including through purported anti-counterfeiting measures which were actually used to control the resale of Course Materials, enforce the use of Inclusive Access, and allow opportunities for the Defendants to meet and communicate regarding the conspiracy.

## AGENTS AND CO-CONSPIRATORS

14.     Barnes & Noble College Booksellers, LLC ("Barnes & Noble"), is a Delaware LLC with corporate headquarters in Basking Ridge, New Jersey. Barnes & Noble operates on-campus bookstores and sold Course Materials through Inclusive Access during the Class Period.

15.     Follett Higher Education Group ("Follett") is an Illinois corporation headquartered in Westchester, Illinois. Follett operates on-campus bookstores and sold Course Materials through Inclusive Access during the Class Period.

16.     Barnes & Noble and Follett are collectively referred to herein as the "Retail Co-Conspirators." Upon information and belief, the Retail Co-Conspirators assisted and conspired with Defendants regarding their Inclusive Access scheme. Plaintiff reserves the right to amend this Complaint to include the Retail Co-Conspirators, or other unknown co-conspirators, as more information is obtained through discovery.

17.     Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this complaint.

18.     Various other persons, firms, companies, and corporations not named as Defendants knowingly and willingly conspired with Defendants and performed acts and made statements in furtherance of the conspiracy and in furtherance of the anticompetitive conduct.

19.     The acts alleged to have been done by any Defendant or co-conspirator were

authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## INTERSTATE TRADE AND COMMERCE

20.     Publisher Defendants are the leading publishers of Course Materials in the United States.

21.     During the Class Period, the Publisher Defendants sold Course Materials throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial District.

22.     Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of Course Materials, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Course Material prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on United States commerce.

23.     The restraints alleged in this complaint have directly and substantially affected interstate commerce in that Defendants have deprived Plaintiff and Class Members of the benefits of free and open competition in the purchase of Course Materials within the United States.

## FACTUAL ALLEGATIONS

### The Soaring Prices of the Course Materials Market.

24.     The United States Course Materials market has long been a lucrative one. The revenue of the United States higher education book publishing industry in 2018 was estimated at 3.69 billion U.S. dollars.

25.     There has been widespread consolidation among the publishers of Course Materials over the last 20 years. It is estimated that the Publishing Defendants control between 80-90% of the United States market for Course Materials.

26.     It is widely known that the prices of Course Materials have been inflated over time. In 2019, the United States Public Interest Research Group ("PIRG") drafted a letter to the Department of Justice regarding a proposed merger between Defendants McGraw Hill and Cengage. In that letter, PIRG noted that "Because there are so few publishers, and because faculty choose books on behalf of their students, the normal rules of supply and demand have broken down." In an interview with Yahoo Finance, the higher education campaign director at PIRG stated that, "The cost of textbooks has risen four times faster than inflation. That's because the textbook market is broken."

27.     Notably, the price of Course Materials has skyrocketed over time, while the cost of recreational books has held relatively steady. This divergence in prices suggests that the rising prices of Course Materials were not based on rising publishing costs. Rather, a better explanation is that the college textbook market was insulated for decades from the normal market forces that would lead to falling, not rising, book prices over time.



CLASS ACTION COMPLAINT FOR DAMAGES

28.     As opposed to a free market, where the consumer has the opportunity to shop around and seek competitive pricing, the Course Material market has long been a classic example of a "captive market," where students have been required to purchase the materials they have been assigned regardless of the cost. This created a highly exploitable market for the Publisher Defendants, who could design materials to appeal to the professors making the decisions on Course Materials without regard to the potential financial distress of their student customers. As a spokesperson for the Scholarly Publishing and Academic Resources Coalition ("SPARC") has stated, "[The publishers] been able to keep raising prices because students are 'captive consumers.' They have to buy whatever books they're assigned."

29.     These rising prices can have profound effects on the academic success of students. Research shows that 65% of students have skipped buying a book at some point in their college career because of the cost, despite 94% of them knowing it would hurt their grade.

**The Growth of the Secondary Market.**

30.     Over time, the rising prices described above drove more students to seek out alternative sources for Course Materials – in particular, a secondary market for cheaper used Course Materials. In response, for much of the last few decades, publishers were simply able to ratchet up prices to offset these lost sales. As Michael Hansen, CEO of Cengage, told Wired magazine, "The volumes of textbooks publishers were selling declined rapidly for years. However, they always had this magical price lever. They could always just increase the prices, so their revenue looked relatively stable."

31.     The industry has also engaged in practices to suppress the secondary market, including releasing new editions on a regular cycle and creating shrink-wrapped textbook "bundles" with supposedly new supplemental material.  The latter practice was disrupted in part in 2010 when 20 USC § 1015b(c)(2) was enacted, which provides that a publisher must make any college textbook

CLASS ACTION COMPLAINT FOR DAMAGES

and supplemental material sold as a bundle also available separately.

32.     But even with these measures, the inability to control the secondary used market became an increasingly large problem for the Publisher Defendants. In its 2012 annual report, textbook publisher Cengage noted that they "face competition from the used textbook market" and that an increasingly efficient secondary market "may materially adversely affect our business." Similarly, McGraw-Hill CEO Nana Banerjee told investors that "[T]here's a massive secondary market that has really disrupted [the] traditional publisher's ability to price in the way it used to."

33.     During the early 2000s, used Course Materials were only easily available from campus bookstores, which routinely priced them at 75% of the cost of new Course Materials. These used sales were acceptable to the Publisher Defendants, as the relatively small price difference between the used and new Course Materials still drove sufficient sales to new, ostensibly updated, versions.

34.     But increasing competition came in from online sources. A 2018 study noted that while the campus bookstores had "rigidly priced" their used books at an "essentially constant" 75% fraction of the new price, that pricing stood in "stark contrast to the much freer competition" from Amazon and other online resellers. In particular, a 2015 study showed that Amazon-purchased textbooks were available at 30% less, on average, than most college bookstores. This growing disparity between the cost of new and used Course Materials, as demonstrated in the chart below, drove more and more students away from purchasing new Course Materials from the Publisher Defendants.

CLASS ACTION COMPLAINT FOR DAMAGES



### The Publisher Defendants Moved to a Digital Format, Creating "Inclusive Access"

35.     In 2016, the Publisher Defendants had to confront the unsustainability of their price gouging, when an across-the-board drop in revenue served as a wakeup call – specifically, McGraw-Hill's revenue declined by 9%, Pearson's by 10%, and Cengage's by 15%. Analysts pointed to increased pushback from faculty, fueled by the textbook affordability movement, and students fleeing to the secondary market as some of the possible causes of these revenue drops.

36.     Accordingly, the Publisher Defendants formed EPEG in 2016, with a stated purpose to fight "counterfeit" textbooks. Upon information and belief, the actual purpose of EPEG was to allow the Publisher Defendants to communicate and plan ways to address the pricing crisis that they faced.

37.     In particular, EPEG developed their "Anti-Counterfeit Best Practices," which created a "white list" of retailers, including the Retailer Co-Conspirators, and encouraged its members to refuse to sell to anyone not only the list. While the implication is that other retailers may be engaged in counterfeiting, the real purpose of this list was to reduce competition from off-campus and online used booksellers.

CLASS ACTION COMPLAINT FOR DAMAGES

38.     But this attempt to limit competition from the secondary market was insufficient on its own. Therefore, the Defendants decided to pursue a move toward digital Course Materials, which would be more readily controllable, and which would effectively eliminate the secondary market.

39.     While various forms of digital coursebooks existed before 2015, the move by the Defendants to push digital coursebooks appears to have been precipitated in part by a 2015 Department of Education regulation, which enabled institutions to include the cost of books and supplies in their tuition or fees. Now instead of buying textbooks with credit cards or cash, students could be automatically charged for course materials by the institution when they enroll. This regulatory change allowed the Defendants to automatically bill students for online Course Materials unless they opted-out of the program, which as described more fully below, is often difficult or outright impossible.

40.     The Publisher Defendants made clear their intentions in agreeing to pursue this move toward digital Course Materials. Tim Peyton, vice president of strategic partnerships at Pearson, said it was no secret that publishers like Pearson had made textbooks too expensive and had seen sales drop as a result. "The print model is really a broken business model for us," he said, adding, "we're thinking about how to move away from print, and move towards digital." Cengage CEO Michael Hansen noted in an interview that his company's digital focus hoped to recapture "students who have been using our materials but have not given us any revenue...These are students that are buying a used book from another student. No revenue for us."  In another article, Hansen stated that the used book market, and implicitly the competition it provides, is "a market that should fall by the wayside if we do our job the right way."

41.     Accordingly, the Defendants jointly agreed to implement the "Inclusive Access" program, or other similar online-only access programs under different names[2]. Upon information and belief, this program was facilitated and enforced by EPEG.  Under Inclusive Access, Plaintiff and Class members would, upon registering for a course, pay for a code that would give them electronic access to the requisite Course Materials. This would often include supplemental materials, such as reading assignments and homework problems that were not available at all outside of Inclusive Access.

42.     The Publisher Defendants refuse to sell Inclusive Access Course Materials to any retailers other than the higher educational institution itself or its official on-campus bookstores, often run by the Retailer Co-Conspirators. Inclusive Access thus acts as an exclusive arrangement between the Retailer Co-Conspirator, the Publisher Defendants, and the institution.

43.     Upon information and belief, near-identical license agreements between the Publisher Defendants, the Retailer Co-Conspirators, and the various educational institutions dictate that Inclusive Access Course Materials will only be sold by these entities and the Publisher Defendants will not sell to others.

44.     There are also exclusivity agreements between the Publisher Defendants and the Retailer Co-Conspirators, which operate when there is not a licensing agreement with an educational institution where the Retailer Co-Conspirator is operating. Similar to the license agreements above, these agreements dictate that the Publisher Defendants will not sell Inclusive Access Course Materials to retailers other than the Retailer Co-Conspirator on these campuses.

45.     Campus stores other than the Retailer Co-Conspirators are willing to participate in

_____

[2] Upon information and belief, the Publisher Defendants have implemented similar exclusive online-only Course Material programs under different names. They are all collectively referred to herein as "Inclusive Access" programs.

Inclusive Access programs, as they receive a cut of the sales. While the profit margins to these stores for Inclusive Access materials are smaller than for print, the curtailing of the secondary market means that the stores receive revenue from a larger number of customers. One university course materials manager described in an interview how the lower margins were also mitigated by lower overheads, stating "We're not purchasing books, we're not paying shipping, we're not having to put any time or effort into returning unused books or paying restocking fees." Therefore, the Defendants faced no pushback or competition from non-conspiring university stores while implementing this scheme.

46.     Class Members' access to the Inclusive Access Course Materials is removed at the end of a semester or other defined period of time. Because of this and the online nature of these Inclusive Access Course Materials, Class Members are unable to resell them. Accordingly, and because of the Publisher Defendants' refusal to sell Inclusive Access materials to off-campus bookstores or online sellers as described above, the secondary market for Course Materials offered through Inclusive Access is eliminated.

47.     The profit motivation for this Inclusive Access scheme is manifest. A 2015 working paper by UCLA Anderson's Matt Schmitt and Tongtong Shi of Analysis Group, an economic consulting firm, suggested that college textbook publishers would enjoy 42.6% higher profits if they could eliminate the secondary market.

48.     The Publisher Defendants have not been shy about openly acknowledging these motivations for the move to digital. Their goal was to eliminate their competition. Cengage laid out the reasoning behind this shift in their Fiscal Year 2019 Annual Report, stating "The growth in our digital business gives us access to a greater number of students in any given classroom and generates new sources of revenue from our existing adoption customers. In contrast to print publications, our

digital products cannot be resold or transferred. We therefore realize revenue from every end user."
On a May 1, 2019 investor call, McGraw-Hill CEO Nana Banerjee stated the continuing course of
action to "[take] out this used secondary market book enterprise that has really been a disruptor for
us."

### Plaintiff and Class Members are *De Facto* Unable to Opt Out of Inclusive Access

49.     Federal law requires that if the Inclusive Access program is paid for as part of tuition
and fees, the institution must have a policy under which the student is able to opt-out of the program.
Accordingly, at most universities that use Inclusive Access, a student has to opt-out; otherwise they
are simply billed for the Inclusive Access Course Materials after enrolling in a course.

50.     In many instances, if a Class Member opted out of Inclusive Access, they would be
unable to succeed in their course. As previously stated, in most cases, Inclusive Access Course
Materials are simply not available elsewhere, and supplemental materials, such as reading
assignments and homework problems are also not available outside of Inclusive Access even if a
Class Member could obtain a copy of the base coursebook. Moreover, many courses require Class
Members to access the Inclusive Access platform for necessary functions, such as submitting
assignments or taking exams. As an example, Pearson's MyLabsPlus service is a platform necessary
for students to submit assignments, which cannot be accessed outside of Inclusive Access.

51.     Institutions will also actively discourage students from opting out. The process for
opting-out is often confusing and implemented under restrictive terms that are not always obvious,
such as locating, completing, and submitting a form within ten days – or for classes shorter than a
full semester, the opt-out period can be a mere three days. The process for opting out at some
universities also varies between platforms, requiring students to access and track down multiple
online systems to submit opt-out requests even within the same educational institution. At other
campuses, students are informed when opting out that "they will not be eligible for an extension on

course assignments while they await arrival of their course materials."

52.     The practical function of these measures is that opting out, for most students, is *de facto* impossible if they want to pass their courses, and they are actively discouraged from even attempting to do so. These measures are effective. Nik Osbourne, the Senior Vice President of Strategy at Pearson, has described the opt-out rate from Inclusive Access programs as "extraordinarily small."

**The Publisher Defendants' Inclusive Access Price-Fixing Scheme Artificially Raised Prices**

53.     While the Defendants may tout that the Inclusive Access programs offer books at lower prices, they are, at best, a discount from the Publisher Defendants' already heavily inflated prices. The prices are still significantly higher than the prices Class Members could obtain in an open, competitive market.

54.     SPARC submitted a letter to the Department of Justice in August of 2019 with the following example:

> McGraw-Hill's Economics, 21st edition can be purchased on the publisher's website in print for $262 or as a 180-day e-textbook for $55.00. The e-textbook is what students typically receive through an inclusive access fee, and it is priced at a 79% discount versus print. McGraw-Hill advertises that inclusive access fees save students "50 to 80 percent off the cost of traditional textbooks," which means that the student may actually be paying more through an inclusive access fee than they would for the same e-textbook directly from the publisher, and at best they would pay only 1 percent less. On the free market, a student could buy the same book on Amazon.com as a one-semester print rental for $26.16 or a used copy for as little as $28.01 — a more than 90% savings.

55.     PIRG noted in its July 29, 2019 letter to the Department of Justice that some contracts for automatic billing programs include an almost 6% automatic annual price increase, ensuring the price of Inclusive Access Course Materials increases much faster than inflation.

56.     Absent Defendants' conduct, Plaintiff and Class members would have numerous alternatives, including the used secondary market, for purchasing Course Materials at lower prices.

Competition between those alternative sources and the Publisher Defendants' sales, including their sales via electronic means, would also force the Publisher Defendants to lower their prices.

57.     Consequently, Plaintiff and the Class Members have paid more for Course Materials than they would in a competitive market, and have suffered antitrust injury as a result of Defendants' unlawful conduct.

## RELEVANT MARKET

58.     Plaintiff alleges that Defendants conspired to unlawfully restrain trade in the market for Course Materials, *inter alia*, through their agreement to implement the Inclusive Access scheme, which allowed the Defendants to restrict the supply of Course Materials, eliminate competition for Course Materials, and thereby charge supracompetitive prices. Plaintiff further alleges that Defendants have established a group boycott to prevent Inclusive Access Course Materials from being sold through sources other than Defendants. This conduct is *per se* illegal under the federal antitrust laws and therefore no market definition is required.

59.     However, if Plaintiff's allegations are adjudged under the rule of reason and a relevant market is required to be pled: the relevant market is the market for Course Materials in courses utilizing Inclusive Access within the United States.

60.     As more fully described above, Defendants used their Inclusive Access scheme to eliminate competition from secondary market resellers for Course Materials, which previously provided a significantly reduced-price alternative to purchasing new Course Materials.

61.     The Publisher Defendants have between an 80-90% market share of the new textbook marketplace, and at least a 90% market share of the relevant market for Inclusive Access Course Materials. At all relevant times, the Publisher Defendants have maintained this market power which

has allowed them to charge supracompetitive prices.

62.    This market is susceptible to collusion due to the small number of participants, captive purchasers who are unable to avoid buying the Inclusive Access Course Materials, and high barriers to entry due to the Publisher Defendants' longstanding relationships with Course Material authors, with professors who decide which Course Materials to utilize, and with the relevant educational institutions.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Classes:

> **The Publisher-Purchaser Class:** All students at institutions of higher education in the United States who purchased Course Materials through Inclusive Access directly from one or more of the Publisher Defendants from January 1, 2016 until the effects of Defendants' conspiracy end (the "Class Period"). Excluded from the Publisher-Purchaser Class are: Defendants, their subsidiaries, parents, affiliates, joint ventures, and employees and co-conspirators; federal governmental entities and instrumentalities; states and their subdivisions, agencies, and instrumentalities; and any judge(s) or jurors assigned to this case.

> **The Retailer-Purchaser Class:** All students at institutions of higher education in the United States who purchased Course Materials through Inclusive Access directly from a licensed on-campus bookstore operated by a Retailer Co-Conspirator during the Class Period. Excluded from the Retailer-Purchaser Class are: Defendants, their subsidiaries, parents, affiliates, joint ventures, and employees and co-conspirators; federal governmental entities and instrumentalities; states and their subdivisions, agencies, and instrumentalities; and any judge(s) or jurors assigned to this case.

64.    Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

65.     There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

    a.  Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, and/or stabilize the prices for Course Materials;

    b.  Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for Course Materials;

    c.  The existence and duration of the agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for Course Materials;

    d.  Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

    e.  Whether Defendants violated 20 USC § 1015b(c)(2);

    f.  Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

    g.  Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and Class Members, and, if so, the appropriate measure of damages; and

    h.  Whether Plaintiff and Class Members are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act and of 20 USC § 1015b(c)(2).

66.     Plaintiff's claims are typical of the claims of the Class Members.

67.     Plaintiff will fairly and adequately assert and protect the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members.

68.     Plaintiff is represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

69.     The questions of law and fact common to the Class Members predominate over any questions affecting only individual members.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a.  The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

    b.  The Classes are readily definable and one for which records should exist in the files of Defendants.

    c.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

    d.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

    e.  Class treatment will permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

71.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

## VIOLATION OF THE SHERMAN ACT §§ 1, 3

72.     Plaintiff incorporates all allegations alleged herein.

73.     Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of the Sherman Act, 15 U.S.C. §§ 1, 3.

74.     Defendants' anticompetitive acts were intentionally directed at the United States Course Materials market and had a substantial and foreseeable effect on interstate commerce by raising and fixing Course Material prices throughout the United States.

75.     The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

   a.   Prices charged to, and paid by, Plaintiff and Class Members for Course Materials were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

   b.   Plaintiff and Class Members were deprived of the benefits of free, open, and unrestricted competition in the United States Course Materials market; and

   c.   Competition in establishing the prices paid for Course Materials has been unlawfully restrained, suppressed, or eliminated, including by the restriction and elimination of the ability to resell Course Materials.

76.     Defendants' and their co-conspirators' anticompetitive activities have directly and proximately caused injury to Plaintiff and Class Members in the United States.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members paid artificially inflated prices for Course Materials.

77.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members were damaged in their business or property by paying prices for Course Materials that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## COUNT TWO

## VIOLATION OF 20 USC § 1015b(c)(2)

78.     20 USC § 1015b(c)(2) provides that: "A publisher that sells a college textbook and any supplemental material accompanying such college textbook as a single bundle shall also make available the college textbook and each supplemental material as separate and unbundled items, each separately priced."

79.     20 USC § 1015b(a) provides, in part, that the section was enacted to "ensure that students have access to affordable course materials by decreasing costs to students" and "to encourage all of the involved parties, including faculty, students, administrators, institutions of higher education, bookstores, distributors, and publishers, to work together to identify ways to decrease the cost of college textbooks and supplemental materials for students while supporting the academic freedom of faculty members to select high quality course materials for students."

80.     Inclusive Access Course Materials include both electronic textbooks and supplemental materials but, in violation of 20 USC § 1015b(c)(2), do not allow these materials to be purchased separately and unbundled, frustrating the purposes of this section as set forth above and not allowing Plaintiff and Class Members the choice of whether or not to purchase the bundled supplemental materials.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.     That the Court determine that this action may be maintained as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court appoint Plaintiff as a Class Representative for both of the Classes defined above;

C.      Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act;

D.      Adjudge and decree that each Defendant, and its successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of any of them or in concert with them, be permanently enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining, or renewing the combination, conspiracy, agreement, understanding, or concert of action, or adopting any practice, plan, program, or design having a similar purpose or effect in restraining competition in the United States Course Materials market;

E.      Adjudge and decree that each Defendant, and its successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of any of them or in concert with them, be permanently enjoined and restrained from violating 20 USC § 1015b(c)(2) by bundling textbooks and supplemental materials and not providing them separately for sale;

F.      Enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class for treble damages determined to have been sustained by Plaintiff and the Class by virtue of Defendants' and their co-conspirators' violations of the Sherman Act;

G.      Award Plaintiff and the Class their attorneys' fees, litigation expenses, and court

costs, as well as pre-judgment and post-judgment interest as permitted by United States law; and

H.      Grant Plaintiff and the Class such other and further relief as the case may require, or

as the Court deems just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury.


Dated:  May 11, 2020                     /s/     *Fatima G. Brizuela*

                                          FATIMA G. BRIZUELA (NY 5467618)
                                          JASON S. HARTLEY (*pro hac forthcoming)*
                                          JASON M. LINDNER (*pro hac forthcoming*)
                                          **HARTLEY LLP**
                                          101 West Broadway, Suite 820
                                          San Diego, California 92101
                                          Tel.: (619) 400-5822
                                          Fax: (619) 400-5832
                                          brizuela@hartleyllp.com
                                          hartley@hartleyllp.com
                                          lindner@hartleyllp.com

                                          *Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR DAMAGES